Filed 11/18/25  P. v. Allan CA4/1
Opinion following transfer from Supreme Court

OPINION AFTER TRANSFER FROM THE CALIFORNIA SUPREME COURT

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D080414 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FSB048987) |
| TRISTAN DARNELL ALLAN, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Bernardino, Brian S. McCarville, Judge.  Affirmed.

Ahrony Appeals Law Group and Orly Ahrony for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting, Michael Dolida and Felicity Senoski, Deputy Attorneys General for Plaintiff and Respondent.

# I

## INTRODUCTION

In 2005, Tristan Darnell Allan robbed a liquor store in Highland, California, with his brother, Christopher Turelle White, and his girlfriend's brother, Darwin Richardson.  During the robbery, White shot and killed the store owner, Steve Hall, and a store clerk, Brian Gregorio.

After a trial, a jury found Allan guilty of two counts of first degree felony murder (Pen. Code, § 187, subd. (a))[1] and two counts of second degree robbery (§ 211).  The jury found a principal was armed with a firearm during the commission of the crimes (§ 12022, subd. (a)(1)), and it returned true multiple-murder and robbery-murder special circumstance findings (§ 190.2, subd. (a)(3), (17)(A)).  Allan was sentenced to five years four months in prison, followed by two consecutive sentences of life without the possibility of parole.  On appeal, our court affirmed Allan's felony murder convictions. (*People v. White* (Sept. 16, 2011, D059000, D059032 [nonpub. opn.] (*White*).)

In 2020, Allan filed a petition for resentencing under former section 1170.95 (currently codified in section 1172.6), arguing his felony murder convictions must be vacated because he could not presently be convicted of murder due to changes to our state's murder laws implemented by Senate Bill No. 1437 (2017–2018 Reg. Sess.).[2]  After an evidentiary hearing, the trial court denied the petition and found the People had proved, beyond a

---

[1]    Further undesignated statutory references are to the Penal Code.

[2]    At the time Allan filed his petition for resentencing, former section 1170.95 codified the procedures governing such petitions.  Assembly Bill No. 200 (2021–2022 Reg. Sess.) renumbered former section 1170.95 as section 1172.6.  (Stats. 2022, ch. 58, § 10.)  For purposes of this opinion, we will refer to this statutory provision as section 1172.6.

reasonable doubt, that Allan was guilty of the felony murders under the amended murder laws. It found Allan was guilty because he was a major participant in the robberies during which the killings occurred, and he acted with reckless indifference to human life.

On appeal from the denial of his petition for resentencing, Allan argued: (1) substantial evidence did not support the court's finding that he was guilty of the felony murders under the state's amended murder laws; (2) the court erroneously denied resentencing based, in whole or part, on its memory from the initial murder trial and our appellate opinion affirming his felony murder convictions; and (3) the court improperly precluded him from introducing relevant and admissible evidence at the evidentiary hearing. In a prior opinion, our court rejected these arguments and affirmed the trial court's order denying Allan's petition for resentencing. (*People v. Allan* (Aug. 23, 2023, D080414) [nonpub. opn.].) Thereafter, the Supreme Court granted review and deferred further action pending consideration and disposition of a related issue in *People v. Emanuel*, S280551.

The Supreme Court subsequently issued *People v. Emanuel* (2025) 17 Cal.5th 867 (*Emanuel*), which concerned a petitioner, like Allan, who claimed there was insufficient evidence to support his felony murder conviction. In that case, the Supreme Court found the evidence was insufficient to support a factual finding that the petitioner acted with reckless indifference to human life and, therefore, the petitioner was entitled to an order granting his petition for resentencing under section 1172.6. (*Id.* at pp. 885–895.)

On September 24, 2025, the Supreme Court transferred the present case back to this court for reconsideration in light of the *Emanuel* decision. After considering *Emanuel,* which differs in several material respects from

3

the present case, we again reject Allan's arguments and affirm the trial court's order denying Allan's petition for resentencing.

II

BACKGROUND

A. *Trial Evidence*[3]

On March 16, 2005, at about 9:00 p.m., two black males, later identified as Allan and White, entered a liquor store called Cee Vee Liquor in Highland. The men wore coverings over their faces. White was armed with a firearm and held the store owner, Hall, and the store clerk, Gregorio, at gunpoint. Allan was unarmed and stood near the store entrance, stole cash and lottery tickets, and fled from the store to a getaway car driven by a third accomplice, Richardson. Less than a minute later, White shot and killed Hall and Gregorio, who had offered no resistance to the robberies. White fled the store and the three perpetrators drove away in the getaway car.

1. *Prosecution Case*

a. *Surveillance Footage*

Cee Vee Liquor had a video surveillance system that captured the robberies and the shooting of Gregorio. At trial, the parties stipulated the armed perpetrator of the robberies depicted on the surveillance footage was White and the unarmed perpetrator of the robberies was Allan.

---

[3]     We granted Allan's unopposed request for judicial notice of the clerk's transcripts, the reporter's transcripts, and the prior appellate opinion from *White, supra*, D059000, D059032. Our factual summary is taken from the clerk's and reporter's transcripts. "Because this appeal requires us to apply the substantial evidence standard of review, we state the facts in the light most favorable to the prosecution as the party that prevailed in the superior court." (*People v. Montanez* (2023) 91 Cal.App.5th 245, fn. 7 (*Montanez*).)

b. *Eyewitness Testimony*

On the night of the robberies, a neighbor who lived near Cee Vee Liquor was seated on his front porch. At about dusk, he saw a white car driving back and forth in front of his house, four or five times, and he grew suspicious. At one point, the car parked 50 to 75 feet away from the driveway to the Cee Vee Liquor parking lot. At another point, the car drove into the parking lot, but then exited it three to five minutes later. The car reentered the parking lot and, ten or fifteen minutes later, drove away at an excessive speed. Soon after, the neighbor heard law enforcement sirens responding to the shootings.

Vanessa P. was working at the deli counter of Cee Vee Liquor when the robberies took place. She was cleaning a cutting board in the store's back washroom when the robberies began, but she later saw White approach the deli counter with a gun pulled out. According to Vanessa, White had a blue bandana covering his face and a hoodie pulled over his head. White pointed the gun at her and demanded that she come from the washroom up to the front of the store. She complied and exited the washroom with her hands up. After Vanessa exited the washroom, she saw White go behind the store's video rental counter where Hall was situated. White shouted, "Where is the safe? I know you have a safe. Is it in the back?" According to Vanessa, Hall replied, "No. I don't have anything. There is no safe." A few seconds later, White shot Hall in the face. White then ran to the front of the store, shot Gregorio in the back of the head, and fled the store.

A customer and her friend's teenage son drove into the Cee Vee Liquor parking lot while, unbeknownst to them, the robberies were ongoing. As the customer pulled in, she noticed a white car in the parking lot. The customer entered the store with her friend's son, saw Hall and Gregorio holding their hands in the air, and saw two men wearing bandanas. One of the men

5

(White) was running around the store. The second man (Allan) left the store carrying an armful of lottery tickets. The customer put her hands up, moved into an aisle with her friend's son, and the two of them overheard the first man demanding money and the store safe. The customer heard gunfire and ran for safety with her friend's son into a back room.

A second customer pulled his truck into the parking lot and parked in front of Cee Vee Liquor mid-robbery. As he drove into the parking lot, he noticed a white car 100 to 150 feet away, which slowly pulled up behind him as he entered the parking lot. The witness started to exit his truck when he heard "two pops" from the store that "sounded like gunshots." Soon after, a black man exited the store. He wore a bandana across his face and held a gun in his hand. According to the witness, someone shouted something from the white car, though he did not know what it was. The witness dove back into his truck and did not see where the man with the gun went.

c. *Post-Robbery Evidence*

Surveillance footage obtained from a convenience store in Corona, California, captured Allan and Richardson cashing in some of the stolen lottery tickets about two hours after the Cee Vee Liquor robberies.

d. *Custodial Interview of Allan*

About a month after the robberies, law enforcement apprehended Allan in Arizona. Detectives Dennis Florence and Scott Shultz of the San Bernardino County Sheriff's Department went to Arizona and, after providing an advisement under *Miranda v. Arizona* (1966) 384 U.S. 436, conducted a custodial interrogation of Allan that was recorded and played for the jury.

During the interrogation, Allan identified himself and White as the perpetrators of the robberies from photos taken from the store's surveillance footage. According to Allan, he and Richardson went together to Cee Vee

6

Liquor the night of the robberies to buy food and a cigar. Richardson then came up with the plan to rob the store because he thought it would "be a good idea" and the store would be an "easy" target. About fifteen to thirty minutes after they initially went into Cee Vee Liquor, they picked up White from "around the corner" in their white rental Toyota Corolla. They drove around, talked about the robbery, returned to the store's parking lot, and committed to robbing the store together. Allan knew White had a gun, but he said he thought it was "a little fake gun," like a "chrome cap gun."

Allan stated that he put a bandana on and followed White into the store while Richardson remained in the getaway car. Allan stood near the door, demanded money from the employees, and collected money and lottery tickets from them. He lost track of White during the robbery, ran outside, and jumped into the backseat of the getaway car. According to Allan, Richardson drove away, but he drove the car up onto a bump or curb, so Allan swapped seats with him. Allan drove the car back around to Cee Vee Liquor, picked up White, and drove the group to Richardson's home in Corona, where they checked their stolen scratcher lottery tickets to see if they had won any money. Later that night, Allan and Richardson cashed in their winning lottery tickets at a convenience store. Allan denied hearing any gunshots and denied knowing anyone had died during the robberies.

2. *Defense Case*

Allan testified in his own defense. He testified he went to Cee Vee Liquor with Richardson about twenty minutes before the robberies to buy food. He testified they picked up White after their stop and formed a plan to rob the store. According to Allan, the plan called for Allan to enter the store while wearing a bandana, intimidate the store occupants, and demand money; for White to enter the store and steal merchandise; and for

7

Richardson to drive the getaway car. He testified White offered him a realistic-looking fake gun to use during the robberies, but he declined it.

Allan testified he exited the car to eat food and White proceeded into the store. He told the jury that he quickly grabbed a white shirt from the car, turned it into a face covering, and followed White into the store. He stated he heard White demand money from the store employees and he demanded money from Gregorio. Allan testified Hall and Gregorio complied with their demands and put money and lottery tickets into bags, which he grabbed.

Allan testified he saw White go behind the deli counter, Allan called out twice for White, and then Allan ran out of the store. Allan said he saw a customer and her son as he exited the store and then jumped in the getaway car, which Richardson drove away. According to Allan, Richardson drove to a friend's house six or eight houses away, where they waited for a few minutes. Allan and Richardson swapped spots in the getaway car, returned to the store, and picked up White as he ran out of the parking lot. Afterwards, they went to Richardson's home to scratch their stolen lottery tickets.

B. *Senate Bill No. 1437*

"Under the felony-murder doctrine as it existed at the time of [Allan's] trial, 'when the defendant or an accomplice kill[ed] someone during the commission, or attempted commission, of an inherently dangerous felony,' the defendant could be found guilty of the crime of murder, without any showing of 'an intent to kill, or even implied malice, but merely an intent to commit the underlying felony.' [Citation.] Murders occurring during certain violent or serious felonies were of the first degree, while all others were of the second degree." (*People v. Strong* (2022) 13 Cal.5th 698, 704 (*Strong*).)

After Allan's judgment became final, the Legislature approved Senate Bill No. 1437, which went into effect January 1, 2019. Senate Bill No. 1437 "significantly limited the scope of the felony-murder rule to effectuate the

8

Legislature's declared intent 'to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*Strong, supra*, 13 Cal.5th at pp. 707–708 [quoting Stats. 2018, ch. 1015, § 1, subd. (f)].) "Penal Code section 189, as amended, now limits liability under a felony-murder theory principally to 'actual killer[s]' [citation] and those who, 'with the intent to kill,' aid or abet 'the actual killer in the commission of murder in the first degree' [citation]. Defendants who were neither actual killers nor acted with the intent to kill can be held liable for murder only if they were 'major participant[s] in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [Penal Code] Section 190.2'—that is, the statute defining the felony-murder special circumstance." (*Id.* at p. 708.)

Senate Bill No. 1437 also created a procedure, now codified in section 1172.6, which allows persons convicted of felony murder under the former murder laws to petition for retroactive relief under the amended murder laws. (Stats. 2018, ch. 1015, § 4.) A petitioner initiates the process by filing a declaration averring he or she is eligible for relief because: (1) a charging document was filed against the petitioner allowing the prosecution to proceed under a felony murder theory; (2) the petitioner was convicted of murder after a trial or accepted a plea offer at which the petitioner could have been convicted of murder; and (3) the petitioner could not presently be convicted of murder because of the changes to the state's murder laws that were implemented by Senate Bill No. 1437. (§ 1172.6, subds. (a)(1)–(3), (b)(1).) If the petitioner states a prima facie case for relief, the court must issue an order to show cause and, in the absence of a stipulation that the petitioner is entitled to relief, schedule an evidentiary hearing to determine

whether to vacate the murder conviction, recall the sentence, and resentence the petitioner on any remaining counts. (*Id.*, subds. (c), (d)(1).)[4]

At the evidentiary hearing, the prosecution bears the burden of proving, beyond a reasonable doubt, that the petitioner is guilty of murder under the amended murder laws. (§ 1172.6, subd. (d)(3).) "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion." (*Ibid.*) The parties may also offer new evidence or evidence in addition to that which was considered at the murder trial. (*Ibid.*) "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (*Ibid.*)

C. *The Resentencing Proceeding*

On August 10, 2020, Allan petitioned for resentencing under section 1172.6. The trial court scheduled a hearing to determine whether he stated a prima facie case for relief, but due to an apparent scheduling miscommunication, neither party attended the hearing. Nonetheless, the court proceeded with the hearing and found Allan failed to state a prima facie case for relief. Allan moved for reconsideration of the summary denial order, which the court granted. Thereafter, the court accepted a stipulation from

---

4 In 2021, the Legislature approved Senate Bill No. 775 (2021–2022 Reg. Sess.), which amended section 1172.6 to allow persons convicted of attempted murder or manslaughter to seek resentencing. (Stats. 2021, ch. 551, § 2.)

10

the parties attesting that Allan stated a prima facie case for relief. The court issued an order to show cause and set the matter for an evidentiary hearing.

At the evidentiary hearing, the prosecution rested its case exclusively on the record of conviction from Allan's murder trial. By contrast, Allan relied on the record of conviction and sought to admit new evidence.

Specifically, Allan introduced into evidence recorded statements that White made to Detectives Florence and Shultz during a custodial interview conducted prior to trial. White told the following story during his interview. On the night of the robberies, Richardson and Allan picked up White from a friend's house and called him outside to their vehicle, where Richardson proposed they rob Cee Vee Liquor because it would be a "perfect lick" and a "clean get away." Richardson stated it was a "cool deal," and "no matter what happens you gonna get away, you can kill everybody in the store and you will still get away clean ain't nothing gonna ever happen."

Richardson, Allan, and White drove over and parked in front of Cee Vee Liquor. Richardson sat in the driver seat, Allan sat in the front passenger seat, and White sat in the backseat. The three defendants started getting cold feet about the robbery, which caused Richardson to say, "Man, I got this gun for nothin' .... Man nah we goin' to do this." They started circling around the parking lot, driving "back and forth, back and forth," while Richardson told White and Allan what they should do during the robbery. At some point, they reparked the vehicle at the store and Richardson offered a gun to Allan, but Allan did not take it because he was "goin' straight" and he was not "going there." Richardson "pointed [White's] way" and White took the gun and a face covering. While Richardson discussed the planned robberies, he stated, "[T]ell them to put they hands up .... [T]ell them to give you the money .... [T]hey get in your way shoot 'em .... [T]hey get in your way shoot 'em ... it's

11

one of the smallest guns made so no matter where you shoot him at it won't kill him but aim for the head or the heart ...."

White entered the liquor store and Allan followed him inside. White went to the back of the store, jumped onto the counter, demanded money and lottery tickets from the store occupants, and jumped down from the counter. He looked around and did not see his brother, so he froze up and panicked. He then shot Gregorio and Hall because Richardson had told him, "if they get in your way shoot 'em ...." White ran out of the store and jumped into the getaway car, which Allan was now driving. Richardson, who was seated in the backseat, demanded the gun back from White. White gave the gun to Richardson and the three perpetrators fled the crime scene.

In addition to introducing White's custodial statements to Detectives Florence and Shultz, Allan sought to admit evidence from three new witnesses. First, he sought to elicit testimony from Dr. Marshall Hennington, a jury and trial consultant. He made an offer of proof Dr. Hennington would testify that Allan's jury was "conflicted" about whether to find him guilty of felony murder, given that it deliberated for a relatively lengthy timeframe (four days) and sent notes to the court requesting clarification on the meaning of certain jury instructions. The prosecution objected to Dr. Hennington's testimony as irrelevant and speculative. The court sustained the relevance objection and precluded Dr. Hennington from testifying.

Second, Allan sought to elicit testimony from Gregory Frost, a private investigator who interviewed White from prison shortly before the evidentiary hearing. According to Allan, White told Frost that Allan, White, and Richardson were all seated in a vehicle outside the liquor store before the robberies. Allan purportedly stepped out of the vehicle to make a phone call,

12

and—while Allan was outside the car—Richardson asked White whether he needed a gun for the robberies. White allegedly replied, "No, don't trip." White also told Frost that White had a reputation for possessing fake guns and he tried to give Allan a fake gun before the robberies, but Allan refused the offer. Finally, White told Frost that Allan was not in the liquor store when the shootings took place, and he did not know White had shot anyone. The prosecution objected to the testimony on hearsay grounds. The court opined that the testimony potentially might fall within the hearsay exception for declarations against interest, allowed Frost to testify, and reserved a ruling on the prosecution's hearsay objection until it received Frost's testimony.

Third, Allan sought admission of a forensic mental health assessment prepared by Dr. Michael Perrotti, a clinical and forensic neuropsychologist who interviewed Allan. In his assessment, Dr. Perrotti opined that Allan perpetrated the robberies when he was financially insecure and suffering from a serious health condition. He also stated Allan was timid, which made him "vulnerable" to complying with the demands of dominant people. The prosecution objected to the assessment as irrelevant. The court opined it did not "see the relevance" of the assessment, but deferred ruling on the objection. The court stated Allan could "make reference to portions of his report" during the hearing. It also stated it would "listen to [the parties'] arguments and references," and thereafter "determine whether or not [it] believe[d] [the report] to be helpful or reasonable for the [c]ourt to consider."

After the court made its evidentiary rulings, Allan's counsel discussed the trial evidence at length and argued why, in the defense's view, it showed Allan was not a major participant in the robberies who acted with reckless indifference for human life. While discussing the evidence of his mental

13

state, Allan's counsel referenced Dr. Perrotti's evaluation and his analysis of the "stressors" Allan allegedly experienced at the time he perpetrated the robberies. The court did not exclude the evaluation or preclude Allan from referencing it.

Thereafter, Allan called investigator Frost to the witness stand. Allan's counsel tried to ask Frost a series of questions about the statements White purportedly made to him during their interview, including whether White said: (1) he had a conversation with Richardson about a gun before the robberies; (2) he tried to give Allan a fake gun; and (3) there was "a plan to hurt anyone" during the robberies. The court sustained hearsay objections to each question. In doing so, the court rejected Allan's claim that the statements were admissible as declarations against White's interest. The court reasoned that the statements were not against White's penal interest because he had already been convicted of the murders of Hall and Gregorio, his appeal from those convictions was final, and he had not filed a petition for resentencing of the murder convictions under section 1172.6.

After the hearing, the court issued a written order denying Allan's petition for resentencing. In its denial order, the court found Allan was ineligible for relief because the prosecution proved, beyond a reasonable doubt, that Allan was a major participant in the underlying robberies and he acted with reckless disregard for human life.

III

DISCUSSION

A. *Substantial Evidence Supported the Court's Finding That Allan Was Guilty of Felony Murder Under the State's Amended Murder Laws*

Allan's primary argument on appeal is that the evidence adduced at the evidentiary hearing was insufficient to support the trial court's determination that he was guilty of the felony murders of Hall and Gregorio. Allan

14

challenges the sufficiency of the evidence underpinning the court's finding that he was a major participant in the robberies during which Hall and Gregorio were killed, as well as the court's finding that he acted with reckless indifference to human life. As we will explain, we conclude the evidence was sufficient to sustain these findings.

    1. *Standard of Review*

In assessing the sufficiency of the evidence to support the court's findings, we apply the substantial evidence standard of review. (*Montanez, supra*, 91 Cal.App.5th at p. 270.) Under that deferential standard of review, " 'we must examine the record independently for " 'substantial evidence—that is, evidence which is reasonable, credible, and of solid value' " that would support a finding beyond a reasonable doubt.' [Citation.] We must 'review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime ... beyond a reasonable doubt. [Citation.] ... [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence. [Citation.] "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' " (*Id.* at p. 270.) " ' "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' " ' the factfinder's decision." (*Id.* at p. 271.)

2. *Substantial Evidence Supported the Court's Finding That Allan was a Major Participant in the Robberies*

Allan argues substantial evidence did not support the court's finding that the prosecution proved, beyond a reasonable doubt, that he was a major participant in the robberies during which Hall and Gregorio were killed.

In *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), our Supreme Court identified a non-exhaustive list of factors relevant to whether a defendant is a major participant in a crime. The factors in a major participant analysis include: the role the defendant had in planning the criminal enterprise that led to one or more deaths; the role the defendant had in supplying or using lethal weapons; the awareness the defendant had of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants; whether the defendant was present at the scene of the killing, in a position to facilitate or prevent the actual murder, or played a particular role in the death; and the defendant's conduct after lethal force was used. (*Id.* at pp. 799–803.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major[.]' " (*Id.* at p. 803.)

We turn now to the evidence relevant to each *Banks* factor and review it in the light most favorable to the prosecution, as the prevailing party.

- <u>Allan's Planning Role</u>: There was extensive evidence Allan played a material role in planning the robberies that culminated in the killings of Hall and Gregorio. In both his trial testimony and his custodial statements to Detectives Florence and Shultz, Allan admitted that all three perpetrators—himself, White, and Richardson—formulated the robbery plan, which envisioned Allan and White entering the store wearing bandanas,

16

Allan intimidating the store occupants and stealing their money, and Richardson acting as the getaway driver. Similarly, in his custodial statements to Detectives Florence and Shultz, White stated that Allan was an active participant in the process of planning the robbery, and Allan even solicited White's help in perpetrating the robberies.

In addition to the inculpatory testimony and statements of Allan and White, there was also circumstantial evidence that the three perpetrators deliberated their plan beforehand, including evidence they drove their car back and forth near the store multiple times, and entered, exited, and re-entered the parking lot, prior to the robberies. Further, surveillance footage depicted Allan in Cee Vee Liquor about twenty minutes before the robberies. Given the close temporal proximity between Allan's visit to the store and the subsequent robberies, a rational trier of fact could find he was casing the store during his initial visit in anticipation of the robberies. The substantial evidence of thoughtful and considered planning weighs heavily in favor of a finding that Allan was a major participant in the robberies.

- Allan's Use or Supply of Lethal Weapons: Although White used a lethal firearm during the robberies, there was no evidence Allan used a lethal weapon or supplied White with a firearm. Thus, this factor does not support a major participant finding. However, "no one *Banks* factor is necessarily dispositive [citation], and the evaluation of a felony-murder aider and abettor's culpability requires a 'fact-intensive, individualized inquiry[.]' " (*Montanez, supra*, 91 Cal.App.5th at p. 271.) Therefore, the evidence relating to the second *Banks* factor does not preclude a finding that Allan was a major participant in the robberies. (*Ibid.* [affirming denial of resentencing petition despite absence of inculpatory evidence relating to second *Banks* factor].)

- <u>Allan's Knowledge of the Dangers Posed</u>:  Regarding the third *Banks* factor, there was no evidence Allan was aware of particular dangers posed by his accomplices to the robberies, White and Richardson.  On the other hand, there was evidence Allan was aware of the particular dangers associated with the underlying robberies he and his accomplices were about to perpetrate.  Allan admitted that, during the planning stage of the robberies, White produced a gun and offered it to him to use during the robberies.  Although Allan purportedly declined the offer, a reasonable fact finder could conclude that he was aware, or should have been aware, that White would carry, and potentially use, the gun he had just offered to Allan.  Further, while Allan claimed to believe the gun offered to him was a "fake gun," or a "cap gun," the trial court was not required to believe Allan's self-serving testimony, and it reasonably could have discredited that portion of his testimony.  (*In re Lopez* (2023) 14 Cal.5th 562, 591 ["It is well settled that [a fact finder] has wide latitude to believe or disbelieve witnesses, or even specific portions of their testimony, as it sees fit."].)

During White's interview with Detectives Florence and Shultz—an interview the defense itself asked the court to consider at the evidentiary hearing—White also made inculpatory statements indicating that Allan was aware the robberies might turn dangerous and even deadly.  According to White, all three perpetrators discussed the robberies in their vehicle before White and Allan entered the liquor store.  During those discussions, Richardson stated, "you can kill everybody in the store and you will still get away clean ain't nothing gonna ever happen."  Then, while Allan was still present in the vehicle, Richardson gave White a firearm and instructed him to shoot anyone who got in his way and "aim for the head or the heart ...."  These incriminating admissions demonstrate that violence was not merely an

18

unplanned consequence of the armed robberies Allan and his cohorts were about to perpetrate. Rather, it was an outcome the perpetrators anticipated and even planned for if complications were to arise during the robberies.

- <u>Allan's Presence at the Crime Scene</u>: It was undisputed that Allan was present inside Cee Vee Liquor—actively participating in the robberies by intimidating the store occupants, demanding their money, and collecting money and lottery tickets from them—until mere moments before White shot and killed Hall and Gregorio. Moreover, according to Allan himself, the store's surveillance footage showed that White drew his firearm while Allan was still in the store. Rather than attempting to diffuse the situation, trying to persuade White to holster his firearm or hand it over to him, or otherwise acting as a moderating force, Allan fled and left the store occupants alone with an armed and increasingly rattled White. Allan's presence "at the crime scene for the ' "entire sequence of criminal activity" ' leading up" to the shootings supports a finding that he "had the ability and opportunity to help reduce the foreseeable risk [White] would use lethal force against the victims, and yet [Allan] did nothing." (*Montanez, supra*, 91 Cal.App.5th at p. 279; see *ibid.* [rejecting petitioner's claim that he could not have done anything to mitigate the possibility of violence because he fled the immediate crime scene shortly before his accomplice fired a fatal gunshot]; see also *In re Harper* (2022) 76 Cal.App.5th 450, 462 (*Harper*) [petitioner was major participant in robbery because, "despite being at the scene of the robbery and close enough to hear the gunshot, 'he made no attempt to help the victim' "].)

- <u>Allan's Conduct After the Use of Lethal Force</u>: The final *Banks* factor requires us to consider Allan's conduct after lethal force was used. (*Banks, supra*, 61 Cal.4th at p. 803.) This factor slightly weighs in favor of a

19

finding of major participation as well. According to Allan, he drove himself and his accomplices away from the crime scene in the getaway car after the robberies. Rather than trying to assist the victims or call 911 for them, he and his companions fled. The men then focused their attention on whether they had stolen winning scratcher lottery tickets. (See *People v. Williams* (2020) 57 Cal.App.5th 652, 664 [petitioner was ineligible for resentencing, in part, because he "admitted that after the shooting he and his accomplices fled the scene, from which the superior court could reasonably infer he did not call for assistance or attempt to render aid to the victim"].)

In his trial testimony and his custodial interviews, Allan denied knowing White had shot anyone at the time they fled the crime scene—a denial he reiterates on appeal. However, there was circumstantial evidence from which a rational trier of fact could find, at minimum, that he was aware White had shot his firearm and potentially harmed the store's occupants. According to one witness, the getaway car was close enough to be visible when the witness pulled his pickup truck into the store parking lot, mid-robbery. He testified he heard "two pops" from the store that "sounded like gunshots," White rushed out of the store holding a firearm, and the getaway car "came pulling up behind [him]." From this evidence, a trier of fact could reasonably find that the occupants of the getaway car heard the gunshots—just like the witness did—and inferred that White had fired the gun he held in his hand.

Viewing all of this evidence in the light most favorable to the prosecution, and presuming in support of the denial order the existence of every fact the court could reasonably have deduced from the evidence, we conclude substantial evidence supported the finding that Allan was a major participant in the robberies during which Hall and Gregorio were killed.

20

3. *Substantial Evidence Supported the Court's Finding That Allan Acted with Reckless Indifference to Human Life*

Allan also challenges the sufficiency of the evidence supporting the trial court's finding that the prosecution proved, beyond a reasonable doubt, that he harbored the requisite mental state to be convicted of the felony murders of Hall and Gregorio. The court found Allan harbored the necessary mental state because he acted with reckless indifference to human life.

In *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), the Supreme Court elucidated the meaning of the mental state of reckless indifference to human life. According to *Clark*, the reckless indifference standard "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.) *Clark* identified the following non-exclusive considerations, many of which overlap with the *Banks* factors, as relevant to whether a defendant acts with reckless indifference to human life: the defendant's knowledge that weapons would be used and/or his personal use of weapons; the defendant's physical presence at the scene and his opportunity to restrain the killer or aid the victim; the duration of the felony; the defendant's knowledge of his accomplice's propensity to kill; and the defendant's efforts to minimize the risk of violence in the commission of the felony. (*Id.* at pp. 618–623.) "Again, no single factor is necessary, nor is any one necessarily sufficient." (*Harper, supra*, 76 Cal.App.5th at p. 460.)

After we issued our initial decision affirming the denial of Allan's petition for resentencing, the Supreme Court issued *Emanuel, supra*, 17 Cal.5th 867, which applied the *Clark* factors in the context of a felony-murder resentencing proceeding. In *Emanuel*, the petitioner and a companion arranged to buy drugs from a drug dealer out of the dealer's truck one afternoon near a public park. (*Id.* at pp. 876–877.) The dealer was

21

reluctant to hand over his drugs, so the petitioner began walking away and urged his companion to leave. (*Id.* at p. 878.) Instead, the companion stayed behind, tried to rob the dealer of his drugs, and hit the dealer on the head with a gun. (*Id.* at pp. 878–879.) The dealer fought back, prompting the companion to aim his gun at the dealer's leg. (*Id.* at p. 879.) However, the dealer hit the companion's hand, which altered the gun's trajectory and caused the companion to fatally shoot the dealer in the neck. (*Id.* at pp. 877–878.)

On these facts, the *Emanuel* court held there was insufficient evidence to support a finding the petitioner harbored a reckless indifference to human life. (*Emanuel, supra*, 17 Cal.5th at p. 875.) The court reasoned the petitioner "did not use a gun or other weapon," and there was no evidence he knew his companion possessed a gun, would bring one to the drug deal, or was likely to use lethal force. (*Id.* at p. 885.) The duration of the crime (as little as nine minutes) was a "neutral" factor. (*Id.* at p. 886.) The court also opined the petitioner's efforts to minimize the risk of violence did not support a finding of reckless indifference to human life, given that the petitioner and his companion arranged to meet the dealer in daylight near a public park. (*Id.* at pp. 887–889.)

Further, although the petitioner was present at the crime scene, the court held that he tried to "act as a restraining influence" by advocating for his companion to leave with him and walking away from the dealer's truck. (*Id.* at p. 891.) Moreover, the petitioner's failure to intervene after his companion pulled out a gun did not support a finding of reckless indifference to human life, as the violence unfolded quickly and his companion's intent to use lethal force was not immediately clear. (*Id.* at pp. 889–892.) In sum, *Emanuel* held the evidence was insufficient to support a finding of reckless

22

indifference to human life because it showed only that the petitioner "set out to commit a robbery in a public place in the middle of the afternoon," the petitioner was unarmed, he did not know of his companion's possession of a gun, "[t]he crime unfolded without a prolonged period of restraint," and, when met with unexpected resistance, the petitioner tried to convince his companion to leave and "began to walk away." (*Id.* at pp. 895–896.)

We now apply these *Clark* factors to the present case and, where applicable, explain how the evidence in this case differs from the evidence at issue in *Emanuel*.

- <u>Allan's Knowledge About Weapons</u>: As noted in our discussion of the *Banks* factors, there was no evidence Allan used a weapon during the robberies. However, there was evidence from which a rational factfinder could conclude Allan was aware, or should have been aware, that White might perpetrate lethal force during the armed robberies by using the firearm that had been offered to Allan prior to the robberies. As noted, White admitted in his custodial interview with Detectives Florence and Shultz that the three perpetrators discussed the robberies beforehand, had misgivings, and debated whether to proceed with the robberies. According to White, those discussions took place while all three perpetrators were in their vehicle, including when they were parked in front of the liquor store and circling the parking lot. During those discussions, Richardson bragged that they could "kill everybody in the store" and still get away with their crimes. He also admonished White, in Allan's presence, to shoot anyone who got in their way and to "aim for the head or the heart ...." These statements contemplating the use of lethal force during the robberies differentiate the present case from *Emanuel*, and constitute compelling evidence that Allan and his associates

23

harbored a "willingness to kill (or to assist another in killing)" in furtherance of their plan to rob the liquor store. (*Clark, supra*, 63 Cal.4th at p. 617.)

- <u>Allan's Presence at the Crime Scene</u>: " '[T]he defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. ... [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.' " (*Clark, supra*, 63 Cal.4th at p. 619.) Allan's presence inside the store during the robberies supports a finding of reckless indifference to human life.

Although Allan fled the store immediately before the shootings, there was evidence from which a rational factfinder could find he was aware White was armed with a firearm, and he was still present in the store at the time White pulled out his firearm. Further, as noted, there was evidence Allan was present when Richardson instructed White that he could kill everybody in the store and he should shoot anyone who got in his way. This evidence gives rise to a rational inference that Allan harbored "some awareness of the risk of impending lethal violence and time to react." (*Emanuel, supra*, 17 Cal.5th at p. 892.) It also distinguishes the present case from *Emanuel*, where the evidence did not "reflect[] intentional inaction indicative of reckless indifference to human life." (*Id.* at p. 891.) Allan's presence at the crime scene until moments before the shootings, his failure to act as a moderating force before he fled the crime scene, and his inaction when White pulled out a firearm during the robberies support a finding that Allan acted with reckless disregard for human life. (*Montanez, supra*, 91 Cal.App.5th at p. 279 [petitioner's presence during crimes displayed reckless indifference, even though he fled the murder scene moments before the fatal shooting].)

24

- <u>Duration of the Felony</u>:  There is no evidence the robberies were protracted, such that there was a greater window of violence.  However, the relatively brief duration of the crimes does not preclude a finding of reckless indifference, given the multi-factored nature of the reckless indifference inquiry.  (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 594 (*Mitchell*).)

- <u>Allan's Knowledge of his Accomplice's Propensity to Kill</u>:  As discussed in the *Banks* analysis, there was no evidence Allan was aware of White's propensity to kill or use violence force.

- <u>Allan's Efforts to Minimize the Risk of Violence</u>:  The final *Clark* factor slightly weighs in favor of the trial court's reckless indifference finding.  As we have discussed, there was no evidence Allan took efforts to minimize the risk of violence, even after he was offered a gun to use during the robberies, Richardson instructed White to shoot witnesses who got in the way, and White pulled out a gun during the robberies.  On the contrary, Allan proceeded with the armed robberies despite the possibility that lethal force would be used and, after White drew his firearm, he fled the crime scene and left the defenseless store occupants to fend for themselves.

Further, while the *duration* of the robberies was not especially lengthy, a reasonable fact finder could conclude the planned *timing* of the robberies contributed to an increased risk of violence for the store employees and customers.  Allan and his compatriots planned the robberies for nighttime, but while the store was open for business, when store employees were still on-site, and when customers could—and in fact did— unknowingly enter the store as the robberies were ongoing.[5]  "[T]he plan to commit the robbery of the [store] during normal business hours when customers would likely be present, posed obvious and extreme risks of lethal violence."  (*People v.*

---

[5]     At trial, Vanessa testified Cee Vee Liquor closed at 10:00 p.m.

*Owens* (2022) 78 Cal.App.5th 1015, 1024; cf. *Emanuel, supra*, 17 Cal.5th at p. 887 [*Clark* factor pertaining to defendant's efforts to minimize risk did not support finding of reckless indifference where defendant and companion arranged drug deal near public park in broad daylight].)

- Allan's Youth:  Since *Clark*, courts have identified "an additional factor that may be relevant to the reckless indifference analysis—the defendant's youth.  'It is well recognized that "[c]hildren 'generally are less mature and responsible than adults' " and " 'often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them' ...."  [Citation.]  As a result, "[t]he law has historically reflected the same assumption that children characteristically lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them." ' "  (*People v. Keel* (2022) 84 Cal.App.5th 546, 558, quoting *In re Moore* (2021) 68 Cal.App.5th 434, 453; see *People v. Ramirez* (2021) 71 Cal.App.5th 970, 990–991 (*Ramirez*); *Harper, supra*, 76 Cal.App.5th at p. 466, fn. 8.)  On appeal, Allan claims the trial court "blatantly ignored" the fact he was 19 years old when he committed the robberies at issue.

We discern no error.  The trial court did not expressly discuss Allan's age in its order denying the petition for resentencing.  However, "a court's 'failure to "discuss" a particular standard does not imply it applied an incorrect standard.  Error on appeal must be affirmatively shown by the record, and "[w]e presume the trial court knew and properly applied the law absent evidence to the contrary." ' "  (*People v. Johnson & Johnson* (2022) 77 Cal.App.5th 295, 322; see *People v. Jones* (2022) 86 Cal.App.5th 1076, 1092 ["In the usual case, the fact that a court did not specifically mention certain evidence does not mean that the court 'ignored' that evidence."].)  Allan has

not directed us to anything in the appellate record indicating the court ignored or failed to consider Allan's age when rendering its decision. Further, while Allan's youth might be relevant to his mental state, it is not decisive of whether he acted with reckless indifference to human life. (*Harper, supra*, 76 Cal.App.5th at p. 470; see *Mitchell, supra*, 81 Cal.App.5th at p. 595 ["The fact of youth cannot overwhelm all other factors."].)

Viewing this evidence in the light most favorable to the denial order, we conclude the trial court did not err in finding that the prosecution proved, beyond a reasonable doubt, that Allan acted with reckless indifference to human life. In stark contrast to the evidence from the *Emanuel* case, the evidence in this case demonstrated that the petitioner, Allan, was aware before the robberies that his compatriot, White, would be armed with a gun during the robberies. There was also evidence that Allan and his cohorts discussed the possibility of using lethal force during the robberies and one of Allan's companions, Richardson, even urged his associates to shoot obstructionist witnesses and aim for the head or heart. Further, there was evidence that Allan was physically present in the store when his companion drew his weapon and, rather than diffusing the situation, asking his companion to leave with him, or imploring his companion to put his weapon away, Allan instead bolted from the crime scene and left the defenseless witnesses to fend for themselves. On this appellate record, we conclude the evidence was sufficient to support the trial court's factual finding that Allan acted with reckless indifference to human life.

B. *The Trial Court Properly Relied on the Record of Conviction to Adjudicate Allan's Petition for Resentencing*

In addition to challenging the sufficiency of the evidence supporting the order denying the petition for resentencing, Allan argues the trial court violated his due process rights by relying on two improper sources to justify

27

its denial order—(1) the trial court's independent memory from the murder trial; and (2) the recitation of facts from our prior appellate opinion affirming Allan's felony murder convictions, *White, supra*, D059000, D059032.  The appellate record refutes Allan's unsubstantiated arguments.

1. *The Trial Court Did Not Rely on its Independent Memory*

At a hearing on a resentencing petition, "the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed.  The court may also consider the procedural history of the case recited in any prior appellate opinion."  (§ 1172.6, subd. (d)(1)(3).)  Further, the parties may "offer new or additional evidence," which the court may consider when rendering its decision.  (*Ibid.*)  However, section 1172.6 does not allow a court to rely on its own recollection of the evidence from the petitioner's murder trial when it decides a petition for resentencing.  (See *People v. Tarkington* (2020) 49 Cal.App.5th 892, 910, fn. 15 ["Memory is fallible, and obviously does not suffice" when a court conducts a prima facie review of a petition for resentencing], abrogated on another ground in *People v. Lewis* (2021) 11 Cal.5th 952.)

Allan notes that, at certain points during the prima facie review hearing and the evidentiary hearing, the court referenced its memory of his murder trial, which the court oversaw.  Based on these references, Allan speculates that the court must have relied on its recollection of the trial to deny his resentencing petition, rather than basing its decision on the record of conviction and the new evidence introduced by the defense.  The fundamental flaw with Allan's argument is that the court expressly and repeatedly stated it was *not* relying on its memory of the trial.

Near the end of the evidentiary hearing, Allan's counsel argued, "[A] judge cannot use their memory to go off of ... and they should use the actual

record, which is the trial transcript, reporter's transcripts, clerk's transcripts, Court of Appeal opinion ...."  In response, the court stated it was not basing its decision on its own memory.  It said, "Unfortunately, I can't try cases and then be, 20 years ago or whatever it is, and then not remember when it's thrown in my face.  *So it's not that I am using my memory to determine exactly what the facts are*.  As you properly beat the facts back into my head from each side, and since there are multiple defendants in this case and I've had to listen to it, kind of more than one case, it reminds me of the testimony. ...  So that's the only thing I say.  ...  I remember when somebody starts talking to me about it, the facts of the case, and that's all I meant to say." (Italics added.)

In the subsequent order denying the petition for resentencing, the court addressed the issue again, stating, "During argument by counsel and based upon the court's review of the case, I reflected on my personal memory of the case, that had been refreshed due to the argument and briefing by counsel. Even though that did occur and I informed counsel that this jogged my memory of the facts, *I am specifically excluding personal memory of the facts of the case and my determination is based solely upon the record of conviction* as well as the briefing and argument by counsel."  (Italics added.)

Absent evidence to the contrary, we presume the court did what it said, and based its decision on the record of conviction and the new evidence offered by the parties—not its memory of the murder trial.  (*People v. Lucero* (2000) 23 Cal.4th 692, 736 ["it is reasonable to assume the court followed its own instruction"]; *People v. Cain* (1995) 10 Cal.4th 1, 81 [assuming court based its order solely on evidence from trial because it stated it " 'base[d] [its] ruling entirely upon the evidence that was presented in the trial' "].)

29

2. *The Trial Court Did Not Rely on Facts from the Appellate Opinion*

As noted, a court conducting an evidentiary hearing on a resentencing petition under section 1172.6 may "consider the procedural history of the case recited in any prior appellate opinion." (§ 1172.6, subd. (d)(3).) However, "the factual summary in an appellate opinion is not evidence that may be considered at an evidentiary hearing to determine a petitioner's eligibility for resentencing." (*People v. Flores* (2022) 76 Cal.App.5th 974, 988, abrogated on another ground in *People v. Patton* (2025) 17 Cal.5th 549.)

In its order denying Allan's petition for resentencing, the trial court stated it "reviewed the unpublished opinion affirming [Allan's] conviction together with the entire record of conviction ...." Based on this statement, Allan hypothesizes that the court impermissibly relied on the factual recitation from our prior appellate opinion when it denied resentencing.

We reject this unsupported argument. The trial court did not state that it relied on the factual recitation from our prior opinion to render its own factual findings; rather, it stated it "reviewed" our prior opinion. This could simply mean the court reviewed and relied on the procedural history section from our prior opinion; or, alternatively, it reviewed our entire decision, but relied only on the procedural history section from our opinion, or on no part of the opinion at all. In either event, such a review would not violate the resentencing statute or Allan's due process rights. (§ 1172.6, subd. (d)(3).) Further, as just noted, the court expressly stated its decision was "based solely upon the record of conviction" and counsel's briefing and arguments.

Because Allan has not directed us to anything in the record suggesting the trial court relied on the factual recitation from our prior appellate opinion, we reject Allan's argument that the court relied on an impermissible source when rendering its decision on his petition for resentencing. (*People v. Clements* (2022) 75 Cal.App.5th 276, 292–293 ["Clements has not identified

30

any portion of our prior opinion that the trial judge relied upon, so she's provided no basis for overturning the trial judge's ruling on the ground that it reached its ultimate conclusion that she was not entitled to relief based on information in our prior opinion rather than information in the trial transcripts the parties submitted for the trial court's decisions."].)

C. *The Trial Court's Evidentiary Rulings Were Proper*

Finally, Allan challenges several of the trial court's evidentiary rulings from the hearing on the petition for resentencing. In particular, he argues the court erred in sustaining the prosecution's relevance objection to Dr. Hennington's testimony, sustaining the prosecution's hearsay objection to portions of investigator Frost's testimony, and limiting his use of Dr. Perrotti's forensic mental health assessment. We disagree with Allan and conclude the trial court's evidentiary rulings were proper.

1. *Legal Standards*

At a hearing on a petition for resentencing, the parties may introduce new evidence or evidence in addition to that which was admitted at the petitioner's trial, but the admissibility of such evidence is governed by the relevance and admissibility rules set forth in the Evidence Code. (§ 1172.6, subd. (d)(3); see *Mitchell, supra*, 81 Cal.App.5th at p. 586 [section 1172.6 "specifies the Evidence Code governs the admissibility of evidence"].)

Under the Evidence Code, "No evidence is admissible except relevant evidence." (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*, § 210.) "Except as otherwise provided by statute, all relevant evidence is admissible." (*Id.*, § 351.) "We review a trial court's ruling on the admissibility of evidence for abuse of discretion." (*People v. Ng* (2022) 13 Cal.5th 448, 540 (*Ng*).)

## 2. *Dr. Hennington*

At the evidentiary hearing, Allan made an offer of proof Dr. Hennington would testify that Allan's jury was "conflicted" about whether to convict him of felony murder. Dr. Hennington based this opinion on factors including the duration of the jury's deliberations and the jury's request for clarification about the meaning of certain jury instructions. The prosecution objected to the proposed testimony on relevance grounds and the trial court sustained the objection. The court did not abuse its discretion by concluding that Dr. Hennington's proposed testimony was irrelevant.

At an evidentiary hearing on a petition for resentencing, the prosecution bears the burden of proving, "beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law," as amended by Senate Bill No. 1437. (§ 1172.6, subd. (d)(3).) The trial court "acts as an independent fact finder and determines whether the People have met their burden in proving the defendant guilty of murder under the revised felony-murder law." (*People v. Saibu* (2022) 81 Cal.App.5th 709, 737; *Ramirez, supra*, 71 Cal.App.5th at p. 984 [" 'it is the [trial] court's responsibility to act as independent fact finder and determine whether the evidence establishes a petitioner would be guilty of murder under amended sections 188 and 189 and is thus ineligible for resentencing' "].) Thus, as relevant to this case, the trial court was required to decide, based on the evidence adduced at the hearing, whether Allan was a major participant in the underlying robberies who acted with reckless indifference to human life.

Because the trial court sits as an independent fact finder at an evidentiary hearing under section 1172.6, there was no relevance to Dr. Hennington's proposed testimony that the jury from Allan's trial was conflicted about his guilt. Even if we accept as true that the testimony would have established that the fact finder from Allan's trial—the jury—was

32

conflicted about whether to convict him of felony murder, such testimony would have had no tendency to prove or disprove any disputed fact to be decided by the independent fact finder at the evidentiary hearing—the court. It sheds no light on whether Allan was a major participant in the robberies who acted with reckless disregard for human life, nor on any other fact in dispute at the evidentiary hearing. Because Dr. Hennington's testimony had no tendency to prove or disprove any disputed fact of relevance, the trial court acted well within its discretion when it excluded the testimony.

3. *Investigator Frost*

During the evidentiary hearing, the court sustained multiple hearsay objections to the testimony of investigator Frost as he sought to relay out-of-court statements made to him by White shortly before the hearing. According to Frost, White told him that he and Richardson had a conversation about guns while Allan was not present and, furthermore, he tried to give Allan a fake gun to use during the robberies, which Allan refused. In sustaining the objections, the court ruled Frost's testimony was hearsay that did not fall within the hearsay exception for statements against interest. Once more, we conclude the court's evidentiary rulings were proper.

Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Hearsay is inadmissible unless it falls within an exception. (*Id.*, subd. (b); see *People v. Romero* (2022) 80 Cal.App.5th 145, 152 ["Hearsay evidence … is inadmissible at the [section 1172.6] evidentiary hearing, unless made admissible by [an] exception to the hearsay rule."].)

One exception to the hearsay rule is when a declarant makes a declaration against interest. (Evid. Code, § 1230.) "The rationale for the exception 'is that "a person's interest against being criminally implicated

33

gives reasonable assurance of the veracity of his statement made against that interest," thereby mitigating the dangers usually associated with the admission of out-of-court statements.' [Citation.] To satisfy the exception, the proponent ' "must show 'that the declarant is unavailable, that the declaration was against the declarant's penal [or other] interest, and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.' " ' " (*People v. Chhoun* (2021) 11 Cal.5th 1, 47 (*Chhoun*).)

Here, the trial court did not abuse its discretion in finding the out-of-court statements made by the declarant, White, were not statements against his penal interest. The court rationally found that White's statements about his alleged pre-robbery conversation with Richardson regarding the use of a gun, and about his alleged offer to give Allan a fake gun, did not bear sufficient indicia of trustworthiness. As the court noted, White had already been convicted of the murders of Hall and Gregorio and his judgment of conviction was already affirmed on appeal, meaning his statements could not be used against him at a criminal trial or retrial. Further, White did not have a pending petition for resentencing under section 1172.6, which potentially could be imperiled by his admissions to Frost. Additionally, White had a strong incentive to take accountability for the crimes, given that his statements could exculpate his brother, Allan.

On appeal, Allan argues that White's statements were declarations against his penal interest because White will have a parole opportunity "in a few years," and his statements could "negatively affect [his] chances of parole." We view the matter differently. To the extent White's statements show he has taken responsibility for his actions, those statements could be neutral or even beneficial to him at his parole hearing. Indeed, the parole board could view White's seeming accountability for his conduct as a positive

34

development weighing in favor of a grant of parole.  Regardless, the court could reasonably conclude the potential parole consequences of White's statements "were too speculative or remote to impinge on penal interest for purposes of Evidence Code section 1230." (*Chhoun, supra*, 11 Cal.5th at p. 48.)

4. *Dr. Perrotti's Assessment*

Finally, Allan asserts the court erred in excluding from evidence the forensic mental health assessment prepared by Dr. Perrotti.  Contrary to Allan's claim, the court did not exclude Dr. Perrotti's assessment.

After the prosecution interposed a relevance objection to Dr. Perrotti's assessment, the court preliminarily ruled that Allan could "make reference to portions of his report" during the hearing and, indeed, he did just that.  The court also stated it would "listen to [the parties'] arguments and references" to the assessment and "determine whether or not [it] believe[d] [the report] to be helpful or reasonable for the [c]ourt to consider."  After listening to the parties' arguments and Allan's references to the assessment, the court did not exclude the assessment or address—let alone sustain—the prosecution's relevance objection.  Thus, the trial court never made the evidentiary ruling that Allan purports to challenge on appeal.

IV

DISPOSITION

The order denying the petition for resentencing is affirmed.


McCONNELL, P. J.

WE CONCUR:


BUCHANAN, J.


CASTILLO, J.